# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| HACENE DJEMIL, FATIHA DJEMIL, RANIA DJEMIL, and A.D., a minor, by and through his Guardian ad Litem Fatiha Djemil,<br><br>Plaintiffs,<br><br>v.<br><br>TESLA, INC., a Delaware corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.:<br><br><br>**COMPLAINT AND**<br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiffs Hacene Djemil, Fatiha Djemil, Rania Djemil, and A.D., a minor, by and through his Guardian ad Litem Fatiha Djemil, complain of and allege the following causes of action against Defendant Tesla, Inc., a Delaware Corporation; and Does 1 through 50, inclusive, as follows:

## INTRODUCTION

### A. The Djemil Family's Accident

1. On February 16, 2020, Plaintiff Hacene Djemil was driving his family's 2018 Tesla Model X in the parking lot of a retail complex located in the 1900 block of Pacific Avenue, Woodland, Washington. He was accompanied at the time by all the members of his family: his wife, Fatiha Djemil (the vehicle's owner), his daughter Rania Djemil, and his son A.D.

2. Mr. Djemil made a right turn from Pacific into a parking lot at a Starbucks in the 1900 block of Pacific Avenue with the intent of parking and entering the Starbucks. Once in the parking lot, while proceeding at a slow speed, Mr. Djemil made another right turn and then a left turn to proceed down the parking lane next to the row of parking spots immediately in front of the store fronts. After travelling a short distance, Mr. Djemil then made a right turn into a parking spot

in front of the Subway restaurant that was adjacent to Starbucks. Mr. Djemil had his foot positioned over the brake pedal preparing to stop as it reached its intended position in the parking spot when, at that moment, the Model X vehicle experienced sudden uncommanded full power acceleration, causing it to surge forward across the sidewalk in front of the commercial businesses and toward the glass windows in the front of the Subway restaurant. Mr. Djemil was able to steer the Model X to the right and into the wall of the restaurant, instead of plowing through the tables and food counter of the restaurant. Mr. Djemil's quick reflexes caused the vehicle to avoid the restaurant's windows. Had the vehicle entered the restaurant through the window area, it would have penetrated the interior dining area of the restaurant, where customers and employees were located.

3. Fatiha Djemil, who was seated in the front passenger seat, suffered serious injuries in the incident, including a cracked sternum. Hacene Djemil, Rania Djemil, and A.D., also suffered physical injuries and emotional distress as a result of the collision.



Complaint
Case No.

4. But for Hacene Djemil managing to turn his vehicle into the wall structure of the Subway, instead of through the glass wall of the restaurant, it almost certainly would have caused catastrophic injury to patrons and employees inside the Subway restaurant.



5. Because the Djemil family was driving in a Tesla automobile, more can be determined about the cause of this particular accident than might be possible with other vehicles. This is because the Tesla Model X is a "computer on wheels," a highly-advanced automobile fitted with sophisticated hardware and software designed to effectively automate as many of the automobile's features as possible.

6. Beginning in September 2014, all Tesla Model S vehicles were manufactured with a camera mounted at the top of the windshield, forward looking radar, and ultrasonic acoustic location sensors that provide the vehicle's computer with a 360-degree view around the car. This equipment allowed the Model S to detect road signs, lane markings, obstacles, and other vehicles. Beginning in October 2016, Tesla upgraded this hardware in all new Model S vehicles to include

eight surround cameras and twelve ultrasonic sensors. Tesla has installed similar camera equipment in the Model X, which it has offered for sale to the public since September 2015. Tesla vehicles, including the Model X, also sport radar and sonar sensors designed to help prevent contact with other vehicles and obstacles on the road.

7. Just as with any other computer, a Tesla vehicle constantly generates data. Indeed, Tesla collects thousands of data points every day regarding the vehicle's use and uploads each vehicle's data to centralized servers for processing and analysis on a regular periodic basis. In addition to the regular uploads, Tesla vehicles are designed to immediately upload this data in the event of a collision. When such incidents occur, Tesla collects the data the automobile generates, but refuses to give the vehicle's owner the data. Instead, Tesla withholds the data, providing only a purported "summary," even after a serious accident such as the Djemil's. In other words, the owner of any Tesla automobile purchases it for many thousands of dollars and drives it in the regular course—generating the data the vehicle's computers are directed to collect and disseminate to Tesla—but Tesla refuses to make that data available to the owner for reasons that it doesn't even bother to explain.

8. Tesla has also installed an Event Data Recorder ("EDR") in each of its vehicles. While the data each individual EDR keeps is regularly overwritten under normal conditions, the EDR preserves all data generated by an incident resulting in an air-bag deployment. The EDR, however, contains only a fraction of the data retrieved from the vehicle and stored by Tesla.

9. This is true even as Tesla designs and manufactures automobiles with more and more automated features designed to shift decision-making from driver to automobile. While fully autonomous driving may still be aspirational, Tesla designs, manufactures, and markets features on the Model X as technologically-advanced, if interim, steps on the road to fully computerized driving. To that end, among the Model X's features is a system called "adaptive" cruise control. Unlike regular cruise control, "adaptive" cruise control interacts with the automobile's surroundings to make decisions about the vehicle's responses. For example, adaptive cruise control is designed so that when engaged, if the automobile in front of a Tesla vehicle suddenly slows, the

Tesla vehicle will react and slow down as well, leaving a manageable gap between them. Conversely, if the lead car speeds up, the Model X will speed to keep pace up to a preset speed selected by the driver.

10. The adaptive cruise control feature is only one example of Tesla's boundless technological ambitions. Its CEO and Chairman, Elon Musk, has explained that Tesla automobiles are effectively designed to be "a very sophisticated computer on wheels." Musk has also explained that "Tesla is a software company as much as it is a hardware company. A huge part of what Tesla is, is a Silicon Valley software company."

11. It is this type of bold and self-assured vision that has made Tesla a technology leader in the automotive market, and Tesla has developed a loyal following among drivers seeking a high-tech alternative to traditional gasoline-powered automobiles. Tesla promises its purchasers not only a cleaner and more environmentally friendly automobile, but also market-leading technology in autonomous driving, allowing more and more vehicle features making drivers' decisions for them.

12. Of course, autonomous driving is not without its challenges. Decisions drivers once made in real time are now made by engineers and designers who assume responsibility to foresee and anticipate all of the variables vehicles may encounter on any particular trip. Each vehicle's computer systems must be programmed and prepared to anticipate and make decisions consistent with the vehicle's safe operation. When the technology works properly, there is certainly the potential for preventing driver error.

13. But autonomous driving is only as good as the hardware, engineering, and programming of the onboard computers used to execute it. Even the most successful and sophisticated computer companies in history—Microsoft and Apple among them—regularly release computers and software with bugs, glitches, and unanticipated problems that cause their computers to unexpectedly crash, malfunction, or work differently than intended. These bugs are serious enough when located in a stationary box on a user's desk—they are magnified exponentially when a computer controls a more than two-ton moving machine capable of

accelerating from 0 to 60 miles per hour in under 4 seconds. In these circumstances, the consequences of computer "bugs" and "glitches" can be catastrophic, as in the case of the Djemil family's Tesla X.

14. Because of the trial-and-error nature of the technology, Tesla vehicles "learn" just as other computer systems. These patches and updates are downloaded precisely because Tesla's programming engineers are unable to anticipate all the glitches, bugs, and problems that will arise in the everyday course of driving and must issue necessary corrections so that the system works properly going forward.

**B.** **Tesla Has Long Known about and Attempted to Address the Problem of Sudden Uncommanded Acceleration in Its Vehicle Models**

15. As Tesla has moved further toward the goal of computer-guided driving, one of the problems that continues to manifest in Tesla vehicles is that they accelerate suddenly and without explanation, absent any driver direction or command. This sudden uncommanded acceleration ("SUA"), in which a Tesla vehicle accelerates to full power even though the driver reports that he or she did not command the acceleration by pressing the accelerator pedal (the "SUA Defect"), has manifested in every Tesla model line to date at rates that far exceed historical rates for any other vehicles. Unfortunately, the Djemil Family's Model X appears to have the same SUA Defect as other Tesla models.

16. The Djemil family's accident has taken place against the backdrop of technological leaps toward the ultimate goal of fully autonomous driving. The premise that computerized systems could drive passengers far more safely than human error will allow has long interested entrepreneurs and engineers, but recent technological advance has brought the future much closer to reality.

17. Of course, for Tesla the move toward autonomous driving was a natural one, given that it was already manufacturing a "computer on wheels." There remain both significant technological and regulatory challenges to fully autonomous driving, and Tesla is not the only corporation interested in solving the puzzle of fully automated driving. Alphabet, the holding

-6-

Complaint
Case No.

company for Google, has put its technological might behind a self-driving project called Waymo. Uber, the ride-sharing application, visualizes thousands of driverless taxis that can move people from Point A to Point B, perhaps obviating the need not only for drivers, but for automobile ownership altogether.[1] And traditional automobile manufacturers are all, either on their own or in partnership, working on their own solutions to autonomous driving. Again, all of this innovation is at a cost of billions of dollars in research and development, and it is unknown whether any or all of these companies will ultimately succeed or whether, if they do, their efforts will be profitable. As such, any market advantage any of them may obtain is a dear one, as it may spell the difference between success and failure. What all agree on, however, is that autonomous driving is an increasingly high-reward gamble, even given the risks.

18. Thus, in October 2016, Tesla announced that the Model X—and all Tesla models—would have the necessary hardware to become fully autonomous, even if such capability was not yet available when the automobile was purchased. The goal would be for Tesla's systems to eventually catch up to the hardware it installed in the vehicle.

19. But Tesla has a history of releasing its automobiles first and fixing its flaws later. This is in no small part because Tesla has a long history of over-promising and under-delivering when it comes to making its new models available to the public. For example, when Tesla announced the Model X it planned to begin offering it to the public by early 2014. But in February 2013, Tesla was forced to delay that release date because it was still trying to maximize production of its prior model, the Model X. It later announced that it was targeting release of the Model X some time in 2015. The first Model X vehicles, however, were not delivered to the general public until late September 2015.

20. Tesla equips Model X vehicles—with systems that should prevent just this kind of accident. After its release, Tesla also added to Model X vehicles a feature called Automatic Emergency Braking ("AEB"), wherein the vehicle's computer system uses its forward-looking

---

[1] One former Google engineer who has since left Google to create his own start-up in the same industry described the competition in this way: "As strong as Google is, the field is stronger." In short, the competition is fierce, and the potential rewards lucrative.

camera and the radar sensor to determine the distance from objects in front of the vehicle. When a frontal collision is considered unavoidable, the AEB system is designed to automatically apply the brakes to reduce the severity of the impact. This is a major selling point, as Tesla trumpets this capability as a safety feature, distinguishing Tesla vehicles from other automobiles.

21. But the AEB system is not enabled when the vehicle is traveling at slow speeds. Furthermore, the AEB system apparently has been designed and programmed to deactivate when it receives instructions from the accelerator pedal to drive full speed into a fixed object. The Model X vehicle does not automatically apply the brakes, or will stop applying the brakes, "in situations where you are taking action to avoid a potential collision." These situations include the driver turning the steering wheel sharply, pressing the accelerator pedal, or pressing and releasing (or pumping) the brake pedal.

22. What this means is that the Model X's computer acts the same way any time the computer believes—rightly or wrongly, as it turns out—that the driver is commanding full throttle acceleration directly into fixed objects immediately in front of the vehicle. The upshot is that Tesla has designed and manufactured a vehicle capable of accelerating from zero to 60 miles per hour in as little as 2.9 seconds—acceleration previously achievable only in a select number of exotic sports cars—and equipped the vehicle with the ability to sense objects in its path and brake automatically to prevent or minimize frontal impacts. But despite all these features, Tesla has programmed these systems to allow the Model X to engage with full throttle acceleration into fixed objects, such as walls, fences, and beams.

23. Likewise, in October 2018, Tesla introduced into all circulating vehicles—including the Model X—a new software program called "Obstacle-Aware Acceleration" ("OAA") which was designed to "reduce the impact of a collision by reducing motor torque and in some cases applying the brakes" if the vehicle detects an object in its driving path. OAA is triggered when a driving gear is engaged, the vehicle is stopped or traveling less than 10 mph, and the vehicle detects an object in its immediate driving path—in other words, in the circumstances when SUA generally manifests in Tesla vehicles, and when SUA specifically manifested in this situation. This

-8-

Complaint
Case No.

software patch was introduced into Tesla model vehicles years after they were first released to the market.

24. Tesla describes this feature as follows:

> **Obstacle-Aware Acceleration**
>
> Obstacle-Aware Acceleration is designed to reduce the impact of a collision by reducing motor torque and in some cases applying the brakes, if Model X detects an object in its driving path. For example, Model X, while parked in front of a closed garage door with the Drive gear engaged, detects that you have pressed hard on the accelerator pedal. Although Model X still accelerates and hits the garage door, the reduced torque may result in less damage.
>
> Obstacle-Aware Acceleration is designed to operate only when all of these conditions are simultaneously met:
>
> - A driving gear is engaged (Drive or Reverse).
> - Model X is stopped or traveling less than 10 mph (16 km/h).
> - Model X detects an object in its immediate driving path.
>
> To disable Obstacle-Aware Acceleration, touch Controls > Autopilot > Obstacle-Aware Acceleration.

25. Plaintiffs allege, based on information belief, that the need for this Low Speed Obstacle Aware Acceleration algorithm was precisely because of the propensity of these vehicles to experience uncommanded high power acceleration when the vehicles are stopped or travelling at very low speed. Indeed, the installation of OAA merely makes the fact that Tesla vehicles continue to exhibit SUA all the more confounding, because it should be operating to mitigate or prevent the hundreds of SUA-related collisions that have occurred in Tesla vehicles.

26. Tesla's failure to resolve the SUA problem in the Model X and its other vehicle models—or to at least mitigate the problem by building in a fail-safe braking mechanism to prevent

Complaint
Case No.

collisions such as Plaintiffs'—is inexplicable. It is made worse by Tesla's apparent response to simply blame the driver—a response consistent with other automobile manufacturers far less technologically advanced and savvy than Tesla. But blaming the driver is not an acceptable excuse. The circumstances described above have now led to the injuries alleged by the Djemil family, and an extremely close call that might have injured or killed innocent bystanders. Tesla must be held responsible for the damage caused and created by its not-reasonably-safe vehicle.

## JURISDICTION AND VENUE

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Plaintiffs are not from the same state as Defendant.

28. This Court has personal jurisdiction over Tesla because it conducts substantial business in the District, and because a substantial part of the acts and omissions complained above occurred within the District.

29. Venue is proper in the Western District of Washington, pursuant to 28 U.S.C. 1391(a) and (b), because a substantial part of the events, acts, and omissions giving rise to these claims occurred in the District.

## PARTIES

30. Plaintiff Hacene Djemil is a citizen of the State of Oregon, who was at all times relevant herein residing in Portland, Oregon. On February 16, 2020, Hacene Djemil was parking the vehicle, when the vehicle experienced sudden uncommanded full power acceleration. The sudden acceleration caused the vehicle to crash through the wall of Subway restaurant, injuring Hacene Djemil and his family and endangering employees and patrons of the restaurant.

31. Plaintiff Fatiha Djemil is a citizen of the State of Oregon, who was at all times relevant herein residing in Portland, Oregon. Fatiha Djemil purchased the 2018 Tesla Model X from Tesla in September 2018. Fatiha Djemil was sitting in the front passenger seat of the Model X when it experienced uncommanded acceleration and crashed in the wall of the Subway store and was seriously injured, suffering a cracked sternum.

32. Plaintiff Rania Djemil is a citizen of the State of Oregon, who was at all times relevant herein residing in Portland, Oregon. Rania Djemil is the daughter of Plaintiffs Hacene and Fatiha Djemil. Ms. Djemil was a rear-seat passenger in the Model X during the February 16, 2020 incident at the Subway restaurant in Woodland, Washington, and suffered physical injury and emotional distress in the accident.

33. Plaintiff A.D., a minor, is a citizen of the State of Oregon, who was at all times relevant herein residing in Portland, Oregon. A.D. is the son of Plaintiffs Hacene and Fatiha Djemil. A.D. was a rear seat passenger in the Model X during the February 16, 2020 incident at the Subway restaurant in Woodland, Washington, and suffered physical injury and emotional distress in the accident.

34. Defendant Tesla, Inc. is a Delaware corporation with its headquarters located at 3500 Deer Creek Road, Palo Alto, CA, 94304. Defendant Tesla does business in all 50 states and the District of Columbia, with its principal place of business in Palo Alto.

35. Tesla manufactured, sold, and warranted the Djemil family's Model X. Tesla and/or its agents, divisions, or subsidiaries designed, manufactured, and installed all the systems in the Model X, including all systems responsible for acceleration and braking.

36. The true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names. Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become true names and capacities of the Defendants designated herein as DOES when such identities become known.

37. Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other

Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## FACTUAL ALLEGATIONS

**A.     Tesla Hurries the Model X to Market Without Fully Addressing the SUA Defect**

38.     Tesla was founded in July 2003 and is headquartered in Palo Alto, California. Tesla claims to use proprietary technology and state-of-the-art manufacturing processes. Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components. The company also provides services for developing and selling electric powertrain systems and components to other automotive manufacturers. It markets and sells its vehicles through Tesla stores and the Internet.

39.     In 2008, Tesla first entered the vehicle market with the production of the Tesla Roadster, an all-electric sports car. In 2012, it began selling the Model S, an all-electric luxury sedan. Following a series of delays, Tesla began selling the Model X, an all-electric luxury crossover sports utility vehicle, in the fourth quarter of 2015.

40.     Tesla's strategy in selling the Models S and X was to sell expensive sports vehicles to high-income consumers, promising the power of a sports car but in an eco-friendly, all-electric package. Tesla's package of features was meant to distinguish it from other automobile companies offering electric vehicles that the public perceived as lacking in power and performance. To capture public interest, Tesla's early models relied heavily on performance factors such as acceleration from 0 to 60 mph, which Tesla automobiles could generally perform under 4 seconds, with a top speed of 155 miles per hour. Since those early days, Tesla has continually pushed the envelope on quick acceleration, reaching 0-to-60 rates comparable to sports cars.

41.     In general, Tesla heavily markets the purported safety of its vehicles, advertising it as "one of the safest SUV's ever built:

Complaint
Case No.



42. Consistent with Tesla's representations, it has designed and manufactured other putative safety features into the Model X. For example, the Model X includes a feature called "Lane Departure Avoidance," which Tesla explains is used when a driver starts departing from a lane without his or her turn signal on. In such cases, the automobile checks to see whether a driver's hands are on the wheel and, if not, the driver will receive a series of reminders and alerts. In cases of emergency, the vehicle will even steer the automobile back into the correct driving lane when it detects that it is drifting out of its lane and a collision may occur. Tesla further advertises

Obstacle Aware Acceleration, which automatically reduces acceleration and can also apply the brakes when an obstacle is detected in front of your car while driving at low speeds.

43. Despite all of the purported safety features described above, the Model X suffers from one or more dangerous defects causing it to accelerate without a command from the driver to do so. Whether the SUA Defect is caused by mechanical issues with the accelerator pedal, an unknown failure in the electronic motor control system, or some other failure in the various electrical, mechanical, or computer systems in the vehicle, the SUA Defect not only causes the Model X to lose control, but it overrides various of the purported "safety" features Tesla has installed in the Model X to prevent accidents from occurring, rendering the SUA Defect even more dangerous than it might be otherwise.

44. Tesla refuses to share vehicle data with its owners. Tesla will only issue what it terms a "summary" of the relevant data but will not give Plaintiff—or any owner for that matter—access to the data he or she generates by driving the vehicle.

45. But whatever the case, members of the general public still report that SUA has been and remains a problem with Tesla vehicles. The most important sources of field data regarding this issue is the National Highway Traffic Safety Administration's Consumer Complaint Database. This publicly available database contains all motor vehicle-related consumer complaints submitted to NHTSA since January 2000. Consumers submit what is called a "Vehicle Owner Questionnaire" in which they are asked to provide information that includes, the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, whether the incident involved a crash or a fire, whether any persons were injured or killed in the incident, the speed of the vehicle at the time of the incident, and a description of the incident along with a description of the vehicle components they believe were involved in the incident.

46. The majority of consumer complaints are submitted online at www.safercar.gov where consumers can input this information directly into the database through their computer. They can also submit complaints by telephone through the Auto Safety Hotline, through submitting a paper Vehicle Owner Questionnaire form, and by submitting consumer letters to

Complaint
Case No.

NHTSA by mail. This information is then entered into NHTSA's ARTEMIS database where it can be searched and reviewed by the general public and vehicle manufacturers alike, by make, model, model year, and component. this database is promoted by NHTSA as a valuable consumer information tool. Just in the past three years, dozens of complaints have been submitted to NHTSA describing Tesla drivers' experience with uncommanded acceleration.

47. According to a study by NASA of uncommanded acceleration reports to the National Highway Traffic Administration from 2000 to 2010, there rate of SUA incidents was 1 per 100,000 vehicles per year.

48. In 2010, the issue became very public when Toyota Motor Company was sued by hundreds of injured parties for claimed SUA events in their vehicles. Toyota Motor Company paid hundreds of millions of dollars in settlement to victims and owners for the claim that there was an electrical defect in the Toyota vehicles that caused SUA events. It also paid the United States government $1.2 billion for concealing this safety defect. According to a December 2009 Consumer Reports analysis of SUA event ratio for Toyota's 2008 model year vehicles, their reported events were 2 per 100,000 vehicles (1 per 50,000 vehicles), or double the average reported by NHTSA.

49. By comparison, within the first year of Model X vehicles being on the road, and with only 18,240 Model X vehicles in use (the vast majority of which had been on the road significantly less than one year), there were thirteen (13) reported incidents of Sudden Uncommanded Acceleration—a staggeringly high rate of SUA incidents of 71 per 100,000 vehicles per year—seventy times the average reported to NHTSA.

50. From September 2016 through June 2020, 192 consumer complaints have been submitted to NHTSA describing SUA events by Tesla vehicles.

51. According to the auto industry publication InsideEVs, Tesla sold approximately 543,540 vehicles in the United States from 2013-2019, with over half of those having been sold since 2018. Thus, the number of Tesla SUA incidents per 100,000/year is many multiples of the historical 1 SUA incident per 100,000 per year that NHTSA has historically reported.

52. The 192 complaints are striking in the similarity of the descriptions of the circumstances under which SUA events occur. They are also alarming in that the incidents reflected in these complaints indicate that SUA events involving Tesla vehicles have caused 171 crashes and injured 64 people.

53. They are also striking in how they are distributed across all Tesla models and model years:

| Tesla SUA Complaints Submitted to NHTSA | | | | |
|---|---|---|---|---|
| | Model S | Model X | Model 3 | Total |
| 2013 | 17 | N/A | N/A | 17 |
| 2014 | 10 | N/A | N/A | 10 |
| 2015 | 18 | N/A | N/A | 18 |
| 2016 | 16 | 22 | N/A | 38 |
| 2017 | 15 | 7 | N/A | 22 |
| 2018 | 12 | 15 | 23 | 50 |
| 2019 | 1 | 2 | 22 | 25 |
| 2020 | 0 | 5 | 7 | 12 |
| Total | 94 | 46 | 52 | 192 |

B. **Tesla Withholds Data Generated by the Owner of the Vehicle**

54. Nevertheless, Tesla has evaded its warranty obligations by failing to tell consumers that their vehicles are not reasonably safe and by representing that the cause of the unsafe SUA condition is driver error or negligence. Tesla refuses to repair the unsafe SUA condition and, in fact, denies that SUA is even a problem on any of its automobiles.

55. Tesla collects a wide range of telematics data regarding the performance, usage, operation, and condition of each Tesla vehicle. Some of the data categories regularly captured by Tesla include the "vehicle identification number; speed information; odometer readings; battery use management information; battery charging history; electrical system functions; software version information; infotainment system data; safety-related data and camera images (including

Complaint
Case No.

information regarding the vehicle's SRS systems, braking and acceleration, security, e-brake, and accidents); short video clips of accidents; information regarding the use and operation of Autopilot, Summon, and other features; and other data to assist in identifying issues and analyzing the performance of the vehicle."

56. Tesla also collects "data about accidents involving your Tesla vehicle (e.g., air bag deployment and other recent sensor data); data about remote services (e.g., remote lock/unlock, start/stop charge, and honk-the-horn commands); a data report to confirm that your vehicle is online together with information about the current software version and certain telematics data; vehicle connectivity information; data about any issues that could materially impair operation of your vehicle; data about any safety-critical issues; and data about each software and firmware update."

57. But Tesla will not give the data to the owner of the vehicle. As Tesla states in the owner's manual, "In addition, and subject to local law, Tesla does not disclose the data recorded to an owner unless it pertains to a non-warranty repair service and in this case, will disclose only the data that is related to the repair."

## CAUSES OF ACTION

## COUNT I

## STRICT PRODUCT LIABILITY

**(Wash. Rev. Code § 7.72.030(2))**

58. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

59. Plaintiffs are informed and believes and based thereon alleges that Tesla designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed, and sold a certain 2018 Tesla Model X, bearing Vehicle Identification Number 5YJXCDE23JF113662 (hereinafter referred to as the "subject vehicle"). Therefore, Defendant is both a "manufacturer" and a "seller" for the purposes of Washington Revised Code § 7.72.

-17-

60. At all times relevant hereto, Tesla knew that the subject vehicle would be operated and inhabited by consumers without inspection for defects.

61. At the time of the collision described above, the subject vehicle was being used in a manner and fashion that was foreseeable by Tesla, and in a manner in which it was intended to be used.

62. Tesla designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its component parts and constituents, which was intended by Tesla to be used for the purpose of use as a passenger vehicle, and other related activities.

63. The subject vehicle was not reasonably safe as designed and manufactured because, at the time of its manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on Tesla to design a vehicle that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product, but rather, instead exposed the users of said product, and others, to serious injuries because of the failure of Tesla to properly guard and protect the users of the subject vehicle, and others, from the not reasonably safe design of said product.

64. The subject vehicle was not reasonably safe because adequate warnings or instructions were not provided with the vehicle at the time of manufacture and sale. The likelihood that the vehicle would cause the Djemil family's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions inadequate. Tesla could have provided the warnings or instructions which the Plaintiffs allege would have been adequate.

65. The subject vehicle was not reasonably safe because adequate warnings or instructions were not provided after the subject vehicle was manufactured, even though Tesla learned, or where a reasonably prudent manufacturer should have learned, about the danger of SUA in its vehicles after it was manufactured. In this case, Tesla was under a duty to act with

regards to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. Tesla failed to exercise reasonable care to inform Tesla users of the not reasonably safe condition of its Model X causing SUA.

66. Furthermore, the subject vehicle was not reasonably safe in that it was unsafe to an extent beyond that which would be contemplated by the ordinary user.

67. Plaintiffs were not aware of the aforementioned not reasonably safe condition of the subject Model X.

68. As a legal and proximate result of the aforementioned not reasonably safe condition of the subject vehicle, Plaintiffs sustained the injuries and damages set forth herein, for which Defendant is strictly liable.

69. Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a. an award of damages compensating Plaintiffs for their injuries and past, present and future economic and non-economic damages in amounts to be proven at trial; including but not limited to special damages for medical expenses, lost wages, and lost household services; and for their general damages for pain, suffering, embarrassment, emotional distress, disfigurement, disability, lost social opportunities lost enjoyment of life, and loss of consortium;

b. award all actual, general, special, incidental, statutory, and consequential damages and restitution to which Plaintiffs are entitled;

c. award pre-judgment and post-judgment interest on such monetary relief;

d. award reasonable attorneys' fees and costs; and

e. grant such further relief that this Court deems appropriate.

Dated: April 7, 2021

Respectfully submitted,

By: */s/ Donald H. Slavik*
Donald H. Slavik WSB: 34718
dslavik@slavik.us
SLAVIK LAW FIRM, LLC
2955 Village Drive, Suite 16
Steamboat Springs, Colorado 80487
Telephone: (970) 457-1011

David C. Wright*
dcw@mccunewright.com
Mark I. Richards*
mir@mccunewright.com
MCCUNE WRIGHT AREVALO LLP
3281 Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Todd A. Walburg*
twalburg@baileyglasser.com
BAILEY GLASSER LLP
1999 Harrison Street, Suite 660
Oakland, California 94612
Telephone: (510) 272-8000
Facsimile: (510) 463-0291

*Pro Hac Vice Application to be submitted*

Attorneys for Plaintiffs

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

By: */s/ Donald H. Slavik*
Donald H. Slavik, WSB: 34718
Attorneys for Plaintiffs